## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NAYA 1740 FUND LTD., NAYA COLDWATER FUND, NAYA MASTER FUND LP, and NAYAWOOD LP, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.   1:22-cv-08756 |
| Plaintiffs, | |
| v. | DEMAND FOR JURY TRIAL |
| COUPANG, INC., BOM SUK KIM, GAURAV ANAND, MICHAEL PARKER, MATTHEW CHRISTENSEN, LYDIA JETT, NEIL MEHTA, BENJAMIN SUN, KEVIN WARSH, HARRY YOU, GOLDMAN SACHS & CO. LLC, ALLEN & COMPANY LLC, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., HSBC SECURITIES (USA), INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, MIZUHO SECURITIES USA LLC, and CLSA LIMITED, | <u>CLASS ACTION</u> |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
## <u>OF THE FEDERAL SECURITIES LAWS</u>

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................. 1

II.     NATURE OF THE ACTION .................................................................................. 1

III.    JURISDICTION AND VENUE .............................................................................. 5

IV.     COMPANY BACKGROUND ................................................................................ 7

V.      PARTIES .................................................................................................................. 9

      A.      Plaintiff ......................................................................................................... 9

      B.      Exchange Act Defendants ......................................................................... 10

      C.      Securities Act Defendants ......................................................................... 11

VI.     SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS ......................... 14

      A.      Materially False and Misleading Statements and Omissions Relied
            Upon by Investors Upon During the Class Period ................................. 14

      B.      The Truth Emerges While Coupang Continues to Issue Materially
            False and Misleading Statements During the Class Period ................. 22

      C.      Additional Scienter Allegations Related to Exchange Act Claims ...... 31

      D.      Loss Causation/Economic Loss ................................................................ 32

      E.      Applicability of Presumption of Reliance: Fraud on the Market ........ 32

      F.      No Safe Harbor ........................................................................................... 34

COUNT I  FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
        AND RULE 10B-5 AGAINST COUPANG AND THE EXCHANGE ACT
        INDIVIDUAL DEFENDANTS .................................................................................. 34

COUNT II   FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
        AGAINST THE EXCHANGE ACT INDIVIDUAL DEFENDANTS ...................... 36

VII.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS ......................... 36

      A.      Materially False and Misleading Statements and Omissions Contained
            in the IPO Materials ................................................................................... 36

      B.      Events After the IPO .................................................................................. 44

**COUNT III  FOR VIOLATION FOR SECTION 11 OF THE SECURITIES ACT AGAINST COUPANG, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS** ................................ 49

**COUNT IV  FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT AGAINST COUPANG, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE BROKER-DEALER DEFENDANTS** .......................... 51

**COUNT V  FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT AGAINST COUPANG AND THE SECURITIES ACT INDIVIDUAL DEFENDANTS** ................................................................................................ 52

**VIII.    CLASS ACTION ALLEGATIONS** .............................................................. 54

**IX.    PRAYER FOR RELIEF** ................................................................................. 56

**X.    JURY DEMAND** .......................................................................................... 57

## I.    INTRODUCTION

Plaintiffs Naya 1740 Fund Ltd., Naya Coldwater Fund, Naya Master Fund LP, and Nayawood LP (collectively "Naya" or the "Plaintiff"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of Coupang, Inc. ("Coupang" or the "Company"), Company press releases, conference call transcripts, investor presentations, and analyst and media reports, and other public reports and information regarding the Company.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## II.    NATURE OF THE ACTION

1.    This federal securities class action, which asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"), arises from Defendants' (as defined herein) materially false and misleading statements and omissions to investors concerning Coupang's anti-competitive practices and other illicit activities that helped pad the Company's revenues and profits to the detriment of Coupang's customers, merchants, suppliers, and employees.

2.    This action is brought on behalf of:

(a)    All person or entities who purchased or otherwise acquired Coupang securities between March 11, 2021 and July 12, 2022, inclusive (the "Class Period"), against Coupang and the Exchange Act Individual Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

(b)     All persons and entities that purchased or otherwise acquired Coupang common stock pursuant, or traceable, or both, to the IPO Materials (as defined herein) issued in connection with Coupang's March 2021 initial public offering (the "IPO"), for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, against Coupang and the Securities Act Defendants (as defined herein).

3.     Under Sections 11, 12(a)(2), and 15 of the Securities Act, the Securities Act Defendants (as defined herein) are liable for materially false and misleading statements contained in the IPO Materials (as defined herein).  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional reckless conduct as to the Securities Act claims.

4.     Founded in 2010, Coupang is one of the largest e-commerce companies in Asia. Headquartered in Seoul, South Korea, the Company uses mobile applications and Internet websites to offer a wide range of products and services throughout the South Korean retail market, including home goods, apparel and beauty products, electronics, grocery and restaurant orders and deliveries, and content streaming.  Not only does Coupang sell first-party goods it sources itself, but it also provides a marketplace for third-party merchandise.  Coupang's relationship with third-party merchants allows it to provide a much wider selection of goods to customers than would otherwise be possible, adding to its appeal and convenience.  While the Company's main operations are located in South Korea, it has operations and support services throughout China, Singapore, Japan, Taiwan, and the United States.

5.     Growing to approximately 68,000 workers, Coupang has established approximately 100 fulfillment and logistics centers in over 30 cities, encompassing over 40 million square feet. Coupang offers hundreds of millions of products, sourced from its owned-inventory and private-

label branded products, third-party selections, and over 200,000 merchants for delivery within hours of customers placing online orders.  Coupang also provides a "Rocket WOW" customer loyalty program which purports to offer additional benefits to its most engaged and frequent customers, including free delivery, enhanced delivery options, and discounts.  Due to its large footprint and quick delivery, Coupang is commonly referred to as the "Amazon of South Korea." Much of Coupang's ability to attract and retain customers is based on the purported convenience and speed of ordering from Coupang made possible by the Company's large supply chain infrastructure and network of workers.

6.      Since inception, Coupang experienced consistent revenue growth, securing its place as the largest player in the South Korean e-commerce market.  The Company's total revenue tripled from $4 billion to almost $12 billion, in the three-year span from 2018 to 2020.  Coupang's revenue continued to grow rapidly as the COVID-19 pandemic (which began in early 2020) increased customers' preference for the conveniences of online shopping.  Capitalizing on its recent growth, Coupang sought to conduct the IPO in the United States.

7.      On February 12, 2021, Coupang filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021 ("Registration Statement").  On March 11, 2021, Coupang filed with the SEC a prospectus for the IPO on Form 424B4, which formed part of the Registration Statement (the "Prospectus" and together with Registration Statement and attendant materials filed or published with these forms, the "IPO Materials").  Pursuant to the Registration Statement, Coupang sold to the investing public 100 million shares of Coupang Class A common stock at $35 per share, for total gross proceeds

of $3.5 billion.[1]  Coupang's IPO was the largest by a foreign company on Wall Street since China's Alibaba Group Holding Limited's IPO in 2014.

8.      The IPO Materials and subsequent Class Period statements were materially false and misleading because they falsely represented the Company's relationships with its customers, merchants, suppliers, and employees in a positive light while failing to disclose the following adverse facts:

(a)      that Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including pressuring suppliers to raise prices of products on competing e-commerce platforms in order to ensure Coupang's prices would be more competitive and coercing suppliers into purchasing advertisements that would benefit Coupang financially;

(b)      that Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers;

(c)      that, unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members;

(d)      that Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions;

---

[1] In addition, certain selling stockholders also offered 30 million shares of their Class A common stock.  Coupang did not receive proceeds from the sale of shares by the selling stockholders.

(e)      that all the above illicit practices exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm the Company's critical relationships with customers, merchants, suppliers, and the workforce; and

(f)      that Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable.

9.      These illicit practices, heightened regulatory risks, unsustainable revenues, and other undisclosed issues were later revealed to the market through a series of public disclosures during 2021 and 2022, including government investigations, regulatory sanctions, and unsafe working conditions that caused worker deaths and the loss of a key fulfillment center.  As a result of these disclosures, the prices of Coupang's securities dropped significantly causing hundreds of millions of dollars in damages to the Company's investors.

## III.    JURISDICTION AND VENUE

10.      The claims asserted arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.      Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b).  Coupang's stock trades on New York Stock Exchange ("NYSE") located in this District.  Further, the Registration Statement represented that Coupang's transfer agent and

registrar for its Class A common stock was American Stock Transfer & Trust Company, LLC, located at 6201 15th Avenue, Brooklyn, New York 11219.

13.    Coupang also broadly and irrevocably submitted to jurisdiction in this District in connection with undertaking the IPO, pledging, in pertinent part, in the Underwriting Agreement for the IPO as follows[2]:

> This Agreement and any transaction contemplated by this Agreement and any claim, controversy or dispute arising under or related thereto shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict of laws that would result in the application of any other law than the laws of the State of New York. *The Company and each Selling Stockholder agree that any suit or proceeding arising in respect of this Agreement or any transaction contemplated by this Agreement will be tried exclusively in the U.S. District Court for the Southern District of New York (the "S.D.N.Y.")* or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York (together with the S.D.N.Y., the "New York Courts") and the Company and each Selling Stockholder agree to submit to the jurisdiction of, and to venue in, such courts.

14.    Because the Underwriter Defendants (as defined herein) were counterparties to the Underwriting Agreement and each of Exchange Act Individual Defendants (as defined herein) and the Securities Act Individual Defendants (as defined herein) authorized the execution of the Underwriting Agreement by Coupang, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

15.    In connection with the acts alleged in this complaint, Defendants (as defined herein), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

---

[2] Emphasis added here and throughout unless otherwise noted.

## IV.    COMPANY BACKGROUND

16.    Founded in 2010 by defendant Bom Suk Kim ("Kim"), Coupang began as a social commerce platform where users could purchase tickets for theaters or travel.  In 2014, the Company expanded to a comprehensive e-commerce platform, directly purchasing products from third parties and selling them to customers.  At that time, Coupang launched "Rocket Delivery service," which delivered same day or the next day packages.  Currently, the Company also offers "Same-Day Delivery," "Dawn Delivery," and overseas shipping options; free 30-day returns; content streaming through "Coupang Play"; grocery delivery through "Rocket Fresh"; and online food delivery service in South Korea through "Coupang Eats."

17.    Coupang predominantly operates in South Korea, one of the most competitive and fastest-moving retail markets in the world.  The Company boasts a highly connected, tech-savvy customer base that relies heavily on mobile device usage.  Coupang competes with a wide variety of online and offline companies providing goods and services to customers and merchants, including traditional retailers and merchandisers, such as department stores, discount warehouses, direct retailers, and home-shopping channels.  The Company also competes in "two-sided markets" where it must attract both customers and merchants to use its technology applications and websites.

18.    Coupang offers hundreds of millions of product stock-keeping units ("SKUs"), sourced from over 200,000 merchants and suppliers through the Company's owned-inventory and third-party selections and its own private-label branded products.  Coupang purports to deliver 365 days a year and guaranteed 1-day delivery or faster on millions of items.  Rocket WOW members also purportedly received unlimited free shipping with no minimum spend, free returns, expedited shipping, and exclusive discounts, among other benefits.

19.     With the onset of the COVID-19 pandemic in South Korea in early 2020, consumers flocked to online shopping *en masse*, and Coupang's growth soared.  The Company's 2020 revenues reached almost $12 billion, up 90% from pre-pandemic levels in 2019.  The market took notice and, by mid-2020, Coupang was named as the second highest-ranked company on the 2020 CNBC "Disruptor List," a list of 50 private companies with breakthroughs influencing business and market competition.

20.     To keep up with the rising demand for its delivery services, Coupang added nearly 25,000 new jobs in 2020.  The Company's revenue principally consists of retail sales earned from online product sales to customers, commissions earned on transactions through its online business, consideration from online restaurant ordering and delivery services, third-party advertising, and subscription fees from its Rocket WOW members.  With its significant revenue growth, Coupang became the largest e-commerce player in the South Korean market.

21.     Coupang sought to go public in the United States to capitalize on the Company's massive growth.  The IPO Materials stated that the Company's annual revenue tripled from 2018 through 2020 ($4 billion to almost $12 billion, respectively).  At the time of the IPO, Coupang had a larger business-to-consumer logistics footprint than any other e-commerce company in South Korea with over 100 fulfillment and logistics centers in over 30 cities, encompassing over 25 million square feet.  The Company's 50,000-person workforce consisted of the largest directly employed delivery fleet in South Korea, including over 15,000 full-time drivers that deliver to many neighborhoods multiple times a day.  In addition, the Company's e-commerce market share in South Korea is estimated to have grown from approximately 7% of the market in 2018 to approximately 14% in 2020.

22.     Coupang held its initial public offering in March of 2021.  On February 12, 2021, Coupang filed with the SEC the Registration Statement for the IPO on Form S-1, which, after two amendments, was declared effective on March 10, 2021.  On March 11, 2021, Coupang filed the Prospectus for the IPO with the SEC, which formed part of the Registration Statement.  Through the Registration Statement, Coupang sold 100 million shares of Coupang Class A common stock to the investing public at $35 per share, generating approximately $3.5 billion in gross proceeds for the Company.  Certain private owners of Coupang, including defendant Kim, sold additional shares in the IPO, the proceeds from which did not go to the Company.

23.     Unbeknownst to investors, leading up to and at the time of the IPO, Coupang's historical revenue and profit growth was artificially inflated by the Company's systemic, improper, unethical, and unsustainable practices in violation of applicable laws and regulations.  Throughout the Class Period, the price of Coupang securities was similarly inflated by Coupang's continuous misrepresentations.  As detailed below, at the time of the IPO, these undisclosed practices exposed the Company to a severe, but unrevealed, risk of reputational and regulatory scrutiny, diminished business and financial prospects, and harm to its critical relationships with customers, merchants, suppliers, and employees.

## V.     PARTIES

### A.     Plaintiff

24.     Plaintiff Naya consists of pooled investment funds managed by Naya Capital Management UK Limited.  Naya purchased Coupang securities, including common stock, options, and contracts for difference ("CFDs")  in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Coupang securities at artificially inflated prices during the Class Period and suffered economic loss and damages when

the truth about Coupang that was misrepresented and omitted during the Class Period was partially and/or fully revealed, as set forth in the attached certification.

**B.    Exchange Act Defendants**

25.    Defendant Coupang, Inc. is one of the largest e-commerce businesses in Asia.  The Company is incorporated in Delaware and headquartered in Seoul, South Korea, and has offices across South Korea, China, Singapore, Japan, Taiwan, and the United States.  The Company maintains a dual-class voting structure designed to ensure that Company insiders maintain control over the Company and its affairs out of proportion with their economic stake.  The rights of the holders of Class A common stock and Class B common stock are identical, except with respect to voting and conversion.  Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 29 votes per share and is convertible into one share of Class A common stock.  Coupang's Class A common stock trades on the NYSE under the ticker symbol "CPNG."

26.    Defendant Kim is the founder of Coupang.  At all relevant times, Kim was Coupang's Chief Executive Officer ("CEO") and served as a Director on Coupang's Board of Directors (the "Board").  Kim beneficially owned all outstanding Coupang Class B stock, giving him majority voting control over the Company before, during, and after the IPO.  Kim sold 1.2 million of his personal Coupang shares in the IPO, generating $42 million in gross offering proceeds.

27.    Defendant Gaurav Anand ("Anand") served as Coupang's Chief Financial Officer at all relevant times.

28.    Defendants Kim and Anand are collectively referred to hereinafter as the "Exchange Act Individual Defendants."  The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

Coupang's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Exchange Act Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Exchange Act Individual Defendants.

29.     The Exchange Act Individual Defendants along with Coupang are herein referred to as the "Exchange Act Defendants."

**C.    Securities Act Defendants**

30.     Defendant Coupang is both an Exchange Act and a Securities Act Defendant (as defined herein).

31.     Defendant Kim is both an Exchange Act and a Securities Act Defendant (as defined herein) and signed the IPO Materials.

32.     Defendant Anand is both an Exchange Act and a Securities Act Defendant (as defined herein) and signed the IPO Materials.

33.     Defendant Michael Parker was Coupang's Chief Accounting Officer at all relevant times and signed the IPO Materials.

34.     Defendant Matthew Christensen was a Director on Coupang's Board at the time of the IPO until he resigned, effective immediately, on June 7, 2021, and signed the IPO Materials.

35.     Defendant Lydia Jett was a Director on Coupang's Board at the time of the IPO until she resigned, effective immediately, on October 26, 2021, and signed the IPO Materials.

36.     Defendant Neil Mehta was a Director on Coupang's Board at the time of the IPO and signed the IPO Materials.

37.     Defendant Benjamin Sun was a Director on Coupang's Board at the time of the IPO and signed the IPO Materials.

38.     Defendant Kevin Warsh was a Director on Coupang's Board at the time of the IPO and signed the IPO Materials.

39.     Defendant Harry You was a Director on Coupang's Board at the time of the IPO and signed the IPO Materials.

40.     The defendants identified in ¶¶ 31-39 above are also referred to herein as the "Securities Act Individual Defendants."

41.     Defendant Goldman Sachs & Co. LLC is a broker-dealer incorporated in the state of New York that performs significant business in this district, including business related to the IPO.

42.     Defendant Allen & Company LLC is a broker-dealer incorporated in the state of New York that performs significant business in this district, including business related to the IPO.

43.     Defendant J.P. Morgan Securities LLC is a broker-dealer incorporated in the state of Delaware that performs significant business in this district, including business related to the IPO.  J.P. Morgan Securities LLC maintains an office in this district.

44.     Defendant Citigroup Global Markets Inc. is a broker-dealer incorporated in the state of New York that performs significant business in this district, including business related to the IPO.

45.     Defendant HSBC Securities (USA), Inc. is a broker-dealer incorporated in the state of Delaware that performs significant business in this district, including business related to the IPO.  Defendant HSBC Securities (USA), Inc. maintains an office in this district.

46.     Defendant Deutsche Bank Securities Inc. is a broker-dealer incorporated in the state of Delaware that performs significant business in the state of New York, including business related to the IPO.  Defendant Deutsche Bank Securities Inc. maintains an office in the district.

47.     Defendant UBS Securities LLC is a broker-dealer incorporated in the state of Delaware that performs significant business in the state of New York, including business related to the IPO.  Defendant UBS Securities LLC maintains an office in the district.

48.     Defendant Mizuho Securities USA LLC is a broker-dealer incorporated in the state of Delaware that performs significant business in the state of New York, including business related to the IPO.  Defendant Mizuho Securities USA LLC maintains an office in the district.

49.     Defendant CLSA Limited is an institutional brokerage and investment group that performs significant business in the state of New York, including business related to the IPO. Defendant CLSA Limited maintains an office in the district.

50.     The defendants identified in ¶¶ 41-49 (collectively, the "Underwriter Defendants") served as the underwriters for the IPO.  According to the Registration Statement, the Underwriter Defendants sold the total 130 million Coupang shares sold in the IPO at $35 per share and shared approximately $95.5 million in underwriting discounts and commissions.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the IPO Materials was a substantial factor leading to the harm complained of herein.

51.     Defendant CLSA Limited, unlike the other Underwriter Defendants, is not a broker-dealer registered with the Securities and Exchange Commission and agreed that it does not offer

or sell any shares of the Class A common stock in the United States in connection with the IPO.

All other Underwriter Defendants, excluding CLSA Limited, are referred to herein as the "Broker-Dealer Defendants."

52.     All Securities Act Individual Defendants and Underwriter Defendants, along with Coupang, are referred to herein as the "Securities Act Defendants."

53.     All defendants, including both Exchange Act Defendants and Securities Act Defendants, are collectively referred to herein as "Defendants."

## VI.    SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.    Materially False and Misleading Statements and Omissions Relied Upon by Investors Upon During the Class Period

54.     The Class Period begins on March 11, 2021, the day Coupang stock began to trade publicly on the NYSE.

55.     The IPO Materials, which Coupang filed with the SEC in February and March 2021, stated in relevant part that Coupang's success and growth was rooted in and relied on, among other factors, its brand and reputation among customers, merchants, and suppliers, as well as its workforce:

> We believe that ***the recognition and reputation of our brand among our customers, merchants, suppliers, and our workforce has contributed to the growth and success of our business. Maintaining and enhancing the recognition and reputation of our brand is critical to our business and competitiveness.***
>
> \*        \*        \*
>
> ***That growth reflects our success in attracting, retaining, and increasing the engagement of our customers.*** In our experience, improvement in customer experience directly correlates with acceleration of customer engagement.

56.     In the IPO Materials, Coupang emphasized that its future success depended on investments it makes in supporting merchants and customers, including by competing to offer the lowest prices:

> We believe that by investing for the long term in technology and **infrastructure with a fanatical culture of customer centricity, we are delivering a superior customer experience at a lower cost and are continuing to redefine standards for e-commerce worldwide.**
>
> \*      \*      \*
>
> To create ever-improving experiences at lower prices for customers, **we focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. These investments help us deliver superior selection, convenience, and low prices to customers while helping merchants to improve and grow their businesses.**
>
> \*      \*      \*
>
> **Low Prices.** Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items. **We achieve this through our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and our creation of a system that rewards merchants for providing competitive prices.** In addition, **cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices.**

57.     In discussing its "Rocket WOW" membership program, Coupang described the program as, "a customer loyalty program to offer **even more value** to [its] most engaged and frequent customers."  The Company called the program "one of the key **long-term drivers**" to Coupang's customer "**growth, retention, and engagement**" based on the program's purported perks, including "**exclusive discounts.**"  The Company also noted its "inten[t] to **continue enhancing the value proposition** of Rocket WOW membership for [its] customers in the years to come."

58.     When discussing how it sources merchandise, Coupang stated:

We have established an extensive network of suppliers and merchants, which enables us to obtain a wide selection of merchandise while maintaining low prices for customers. We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers. We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers. Our marketplace attracts a large number of merchants, including small and medium-sized businesses, **which enables us to obtain a wide and unique selection of merchandise. As a result, we are able to offer hundreds of millions of SKUs while delivering low prices and a superior experience for our customers.**

59.     Coupang further emphasized the importance of its merchants, and the merchant loyalty it fosters, as key to its ability to offer customers the best value:

**How We Serve Merchants.** We believe that our merchants and the selection that they bring significantly enhance our customer offerings. We have expanded our merchant base over time and **fostered long-term merchant loyalty as we extended our value proposition through merchant solutions. We will continue to partner with merchants and provide solutions that enable them to grow, scale, and succeed.**

\*          \*          \*

**Partnership With Small Merchants**

\*          \*          \*

**We will continue supporting small merchants in 2021.** We are working with the Korean Fair Trade Commission on a joint program to provide small merchants with assistance with early settlement of transactions, securing loans, **and support for promotional programs, including coupons and advertising. We intend to continue supporting small merchants through further financial aid and marketing services.**

60.     According to Coupang, its competitive prices and varied inventory, keys to its success, were possible because of its merchants:

In addition to our owned-inventory selection, we offer hundreds of millions of SKUs sourced from over 200,000 merchants on our marketplace. **Our search technology produces a simplified**

16

*experience that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results, helping customers find, compare, and make purchasing decisions easily.*

\*        \*        \*

*Our ability to attract new customers and increase spend from existing customers depends on our ability to provide a superior experience. To this end, we offer a wide selection of products at competitive prices* and an unparalleled delivery experience, convenient online shopping, and comprehensive customer service. *We have developed technology that enables us to increase our operating efficiency through enhanced product merchandising and supply chain management, and to provide our customers with personalized product promotions and recommendations.*

61.     The IPO Materials represented that Coupang's search and recommendation functions enhanced customer experience by not organizing searches by merchant, but by product:

AI-Driven Search and Personalized Recommendations. The foundation of our search and recommendations is a product knowledge graph *that organizes by product, not by seller, which enhances the customer experience. Search and recommendation results are aided by deep learning, data analytics, and image recognition among other inputs to produce greater relevance and personalization.* As a result, we believe *customers can identify what they want and the best value for that product easier through our tools than those on competitive services* that require customers to sort through multiple sellers to compare offers for a given product.

62.     The IPO Materials downplayed an ongoing investigation by the Korean Fair Trade Commission ("KFTC") into Coupang's relationships with suppliers and failed to disclose the severity of the issues under review or the scope and nature of the Company's illegal and anti-competitive behaviors that posed an exceptional risk of adverse regulatory action, stating, in pertinent part, as follows:

In 2019, LG Household & Healthcare ("LGHH") filed a complaint with the Korean Fair Trade Commission ("KFTC") alleging that [Coupang] violated the Korean Act on Fair Transactions in Large Retail Business and Monopoly Regulation and Fair Trade Act. The

complaint claimed, among other issues, that [Coupang] engaged in unfair returns of LGHH products, illegally requested that LGHH disclose confidential business information, and unfairly refused to do business with LGHH.

Following the complaint, the KFTC has made two field investigation visits to our office in July 2019 and October 2020. ***We have provided documents and evidence in response to the investigation.*** In addition to LGHH's allegations, the investigation addresses our negotiations and contracting with retail suppliers generally. ***The investigation is ongoing, and we are cooperating with the investigation. Under Korean law, the issues addressed in the investigation can be resolved through civil, administrative, or criminal proceedings.*** The ultimate case resolution ***could include fines***, orders to alter our processes or procedures, and criminal investigations or charges against individuals or the company.

63.     The IPO Materials further mischaracterized the various forms of "consideration" Coupang received from suppliers in exchange for its services, including "rebates" and "advertising services," stating, in pertinent part, as follows:

> ***The Company receives consideration from suppliers for various programs, including rebates, incentives, and discounts, as well as advertising services provided on its website and mobile applications.*** The Company generally records these amounts received from suppliers to be a reduction of the prices the Company pays for their goods, and a subsequent reduction in cost of sales as the inventory is sold.

64.     The IPO Materials highlighted Coupang's marketing efforts and stated that the Company's new advertising offerings and "promotions" would continue to positively expand Coupang's addressable market, stating, in pertinent part, as follows:

> In addition to our e-commerce services, we also have a new offering in the online advertising space. ***We offer opportunities to advertise on our websites and mobile applications, including through banner advertisements, joint promotions, and other programs. This offering is in the early stages, and we will continue to innovate.*** In the near-to-medium term, we expect this offering to expand our total addressable market to include the advertising market, which was $12 billion in 2019 and is expected to grow to $14 billion by 2024.

*        *        *

We market our offerings to customers directly through brand advertising and direct marketing. ***We use broad-based promotional campaigns, such as media ads, to promote opportunities our service provides. Our direct marketing primarily consists of customer discounts, promotions, and referrals. We attract customers through sponsored search, social networking sites, email marketing campaigns, and other similar initiatives.***

65.    In addition, the IPO Materials highlighted Coupang's focus on "Social Impact and Human Capital Resources" and "Initiatives For Our Workforce" and represented that Coupang was providing its employees with a "better" workplace – which the IPO Materials characterized as "one of the reasons for [Coupang's] success" – stating, in pertinent part, as follows:

In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week. We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits. The vast majority of drivers in the industry receive neither. Additionally, we are planning to grant up to ₩100 billion, or approximately $90 million, of restricted stock awards to our frontline workers and non-manager employees. We believe we are the first company in Korea to make our frontline employees stockholders.

***We hope such examples demonstrate that innovation can unlock both a better world for our customers and a better workplace for our employees . . . We want to inspire others to follow our lead.***

*        *        *

Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. ***We consider our employee relations to be positive.*** For example, we hire our Coupang Friends parcel delivery drivers as full-time employees ***with stable work, manageable hours, and competitive benefits, which differs from the market practice of employing parcel delivery drivers as contractors. We are committed to offering our***

> *employees industry-leading wages, comprehensive benefits, and training programs.*
>
> *We subscribe to the philosophy that we, our suppliers, merchants, and employees should prosper together.*
>
> *        *        *
>
> *Our employees and frontline workers are the backbone of Coupang and one of the reasons for our success.*

66.    The IPO Materials also credited the Company's "Technology," "Customer-to-Product Matching," "Social Impact and Human Capital Resources," "Initiatives For Our Workforce," and "Partnership With Small Merchants," among other factors, as keys to Coupang's competitiveness, stating, in pertinent part, as follows:

> *We believe that we are well positioned to effectively compete on the basis of the factors listed above.* We also face competition from major global Internet companies, such as eBay. However, at this time, foreign e-commerce companies have a limited presence in Korea.

67.    The statements in ¶¶ 55-66 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the IPO:

(a)    that Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including pressuring suppliers to raise prices of products on competing e-commerce platforms in order to ensure Coupang's prices would be more competitive and coercing suppliers into purchasing advertisements that would benefit Coupang financially;

(b)    that Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform in order to prioritize its own private-label branded

20

products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers;

(c)     that, unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members;

(d)     that Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions;

(e)     that all of the above illicit practices exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm the Company's critical relationships with consumers, merchants, suppliers, and the workforce; and

(f)     that Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable.

68.     The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the IPO Materials.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the IPO Materials of "the material factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how [the] risk affect[ed] [Coupang] or the securities being offered." The IPO Materials failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item

105.  Indeed, the purported risk disclosures provided in the IPO Materials, to the extent they were

relevant at all, were themselves materially misleading because they failed to disclose the true facts

impacting Coupang's business, operations, and financial results and/or characterized materially

adverse facts that had *already* materialized as contingent possibilities that *may* or *could* impact

Coupang in the future but that had not yet materialized.

### B.    The Truth Emerges While Coupang Continues to Issue Materially False and Misleading Statements During the Class Period

69.    On or around April 27, 2021, just a few months after Coupang represented to

investors that its positive treatment of employees gave it a competitive advantage, *United Press

International* reported on systemic, unsafe working conditions for Coupang's delivery drivers and

employees at Coupang's fulfillment centers, noting that nine Coupang workers had died over the

past year due to an inhumane working environment.  The report further stated that the Committee

for Coupang Workers' Human Rights and Health, created to improve the Company's workplace

conditions, was pushing to form a labor union to force a safer work environment in response to

poor conditions at the Company.  The report quoted the co-chairman of the committee as stating:

"'The management method of running a business at the expense of people's lives should not be

tolerated for any reason. Humans are not machines.'"  The report further emphasized Coupang's

efforts to "muzzle media coverage" by suing journalists who had written about the Company's

worker deaths.

70.    On this news, Coupang share price *dropped $1.96 per share, or 4.3 percent,* over

the next two trading days to close at $43.71 per share on April 28, 2021.  Despite this report, and

as discussed *infra*, the extent of the unsafe working conditions running rampant at Coupang, and

its effect on Coupang's business had yet to be fully disclosed to the public.

71.     On May 12, 2021, Coupang hosted its earnings call for the first quarter of 2021 (the "Q1 2021 Earnings Call").  During this call, Defendant Kim emphasized Coupang's ability to provide low prices and high-quality services to customers, and that Rocket WOW members received special advantages:

> Our unique investments and growing scale create operational efficiencies, which we can pass on to our customers in the form of lower prices. According to a recent third-party study, Coupang's prices were cheaper on average across all surveyed product categories. And *we estimate that Rocket WOW customers saved over $200 million in shipping fees in the first quarter alone*.
>
> . . . *All the benefits we offer customers are amplified by our Rocket WOW membership.* Fueled by access to services like Dawn and Same-Day Delivery as well as our streaming video offering Coupang Play, Rocket WOW members purchase with significantly higher frequency and across more categories than non-WOW members.

Defendant Kim's foregoing statements concerning the Rocket WOW customer loyalty program were false and misleading because Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members.

72.     On the Q1 2021 Earnings Call, Defendant Kim further emphasized that Coupang's competitive advantage was its orientation towards the customer: "*the most important competitive advantage that Coupang has is really our orientation.* We've made—we've always worked backwards from the customer."  This statement misled Coupang investors because it falsely suggested that customer service remained Coupang's priority while the Company's practices of improperly adjusting search algorithms and manipulating product reviews were exploiting its customers.

73.     On June 17, 2021, a deadly and devastating fire broke out in the basement of the Company's Deokpyeong Logistics Fulfillment Center, located south of Seoul.  It took emergency response workers multiple days to extinguish the blaze.  Tragically, one firefighter became trapped

in the building and was later found dead.  The fire sparked outrage among the public in South Korea.  Protestors claimed that the fire resulted from Coupang's imposition of inhumane working conditions.  According to a statement issued by a transportation union under the Korean Confederation of Trade Unions, "[a]ctivation of sprinklers was delayed because they were shut off due to frequent malfunction."  ***Thousands of users posted online claiming to have deleted their Coupang accounts under a hashtag that translated to "Leave Coupang."  Many of the posts chastised the Company's poor working conditions and accused Coupang of overworking its employees in its warehouses.***  Opposition lawmaker Kim Yong-pan, a member of the Public Administration and Security Committee in the National Assembly, South Korea's legislature, called the fire "a sad event that shows negligence of safety is still prevalent in our society."  ***Aside from consumer criticism, this fire would ultimately cost Coupang millions of dollars in lost inventory, equipment, and other charges.***  Clearly, the fire damaged Coupang's business and badly harmed its reputation among current and potential customers.  However, Coupang did not disclose the full costs of either the fire or the unsafe working conditions to which the Company was subjecting employees.

74.    On July 5, 2021, several news outlets, including the *Financial Times* in an article titled "Coupang faces probe over alleged manipulation of search algorithms," reported that Coupang was being investigated over ***"allegations it manipulated search algorithms to [prioritize] its own products over those of suppliers,"*** by the Korea Fair Trade Commission.  Such manipulation not only exposed Coupang to regulatory consequences but threatened the merchant relationships on which Coupang relied by promoting Coupang's products at the expense of those sold by third-party sellers.

75.     On this news, Coupang's stock price **dropped $0.51 per share, or 1.3 percent,** to close at $39.95 per share on July 6, 2021.  Nonetheless, investors had yet to learn the full extent of the risks to which Coupang exposed itself by manipulating its search algorithms.

76.     Meanwhile, the damage caused to the Company by the June 2021 fire and Coupang's unsafe and extreme working conditions was still being revealed.  On August 11, 2021, in its second quarter 2021 earnings release, Coupang reported a $518.6 million loss for the quarter, **a fivefold increase from its loss in the second quarter of 2020**.  This outsized loss was due primarily to almost $300 million in inventory and equipment losses due to the June 2021 fire.  According to an August 12, 2021 *Financial Times* article discussing these developments, **the fire was a major contributor to the losses.**  An article in *Korea JoongAng Daily* wrote that **the fire "more than doubled [Coupang's] loss."**

77.     On this news, Coupang's stock price **dropped $3.07 per share, or 8.3 percent,** to close at $34.13 per share on August 12, 2021.  While the amount of property damage from the fire was revealed due to Coupang's unsafe conditions, the negative impact of these conditions on the Company's employees had yet to be fully disclosed.

78.     Nonetheless, Coupang continued to tell investors that the Company was an ideal workplace focused on the health and safety of its employees.  On August 11, 2021, Coupang hosted an earnings call for the second quarter of 2021 (the "Q2 2021 Earnings Call").  During this call, Defendant Kim doubled down on Coupang's claims that the Company was "continuing to make Coupang the best workplace," by providing benefits to its drivers and "making meaningful investments to help employees improve their health and increase health awareness . . . since the beginning of 2020, we've added over 600 safety employees and invested over $200 million in worker safety initiatives."  These statements were false and misleading because the Company's

workplace continued to be riddled with health and safety issues that were causing staffing problems and operational inefficiencies.

79.    On the Q2 2021 Earnings Call, Coupang emphasized its focus on attracting third-party sellers to Coupang and how building those positive relationships allowed Coupang to better serve its customers.  Defendant Kim claimed that these relationships "increase[] selection and convenience for customers, which in turn attracts even more customers and higher frequency, broadening the top of the funnel for both offerings."  Further, during the Q2 2021 Earnings Call, Defendant Kim claimed that Coupang's third-party merchants' growth "accelerat[ed] on the back of strong [first-party] growth," suggesting a symbiotic relationship between the two categories.  In fact, Kim told investors during that call that these offerings were "growing fast and fueling one another," not competing.  The foregoing statements were false and misleading because Coupang had been engaging in unlawful sales and marketing practices that were exploiting its third-party merchants.

80.    On August 18, 2021, according to an article in *The Korea Times*, ***Coupang was sanctioned by the KFTC for forcing "hundreds of [third-party] sellers from early 2017 to September 2020 to comply with its unlawful sales and marketing policies to maintain its competitive edge over other online retailers amid the fierce battle for market dominance."***  This included pressuring sellers to raise prices in goods sold at rival marketplaces "to ensure that [Coupang] could offer those products at the cheapest prices," and coercing "suppliers to purchase ads."  Less than a week after Coupang again represented that its positive relationships with third-party sellers allowed Coupang to better serve its customers, investors were now learning that Coupang was forcing third-party sellers to comply with harsh and illegal policies.  This both exposed Coupang to large regulatory liability and threatened to harm the merchant relationships

upon which Coupang relied.  This disclosure, however, did not fully disclose Coupang's prioritization of its own products over third-party sellers.

81.     On this news, Coupang stock dropped **$1.08 per share, or 3.4 percent,** over the following two trading days to close at $31.29 per share on August 20, 2021.

82.     On September 10, 2021, ***a KFTC representative announced that Coupang was participating in, and would be regulated for, search algorithm manipulation that had improperly prioritized its own products over those of third-party sellers.***  This announcement signaled a significant expansion of the regulator's prior findings that Coupang had engaged in anti-competitive business practices with suppliers.  While attending the "Fairness and Transparency in Search Algorithms and Competition Issues" conference, Vice Chairman of the KFTC Kim Jae-Shin specifically mentioned Coupang by name when attacking e-commerce businesses engaged in illicit business practices such as search algorithm manipulation and stated: "[W]e have been receiving complaints that major online shopping platforms placed their own private-brand (PB) products in a better place on their page, while pushing competitors' products down to the bottom."  As discussed *infra*, this announcement still did not fully disclose the reputational and regulatory risks to which Coupang's manipulation of its marketplace in favor of its first-party products exposed the Company.

83.     On this news, Coupang stock ***dropped $0.27 per share, or 0.9 percent,*** to close at $29.98 per share on September 10, 2021.

84.     On November 12, 2021, Coupang released its financial report for the third quarter of 2021, disclosing much higher than anticipated costs from the June 2021 fire, especially costs associated with labor and operations.  During Coupang's earnings call for the third quarter of 2021 (the "Q3 2021 Earnings Call"), ***Defendant Kim disclosed that the Company was having trouble***

***hiring employees and that this difficulty was attributable in part to the June 2021 fire.  Further,***
***Defendant Kim disclosed that the fire had "lead to [] inefficiency in [Coupang's] network."***
***Similarly, in its related quarterly financial report, Coupang stated that the fire had reduced the***
***Company's capacity.***  This further revealed to investors that Coupang's dangerous working
conditions, and the fire it caused, had seriously undermined Coupang's ability to deliver promised
services to its customers, harming its business overall.

85.     On this news, Coupang's stock price ***dropped $2.61 per share, or 8.9 percent,*** to
close at $26.58 per share on November 12, 2021.

86.     Despite disclosing the indirect costs of the Company's dangerous working
conditions, Defendants continued to mislead investors during the Q3 2021 Earnings Call by
insisting that Rocket WOW memberships induced consumer loyalty by providing an enhanced
consumer experience.  Specifically, in discussing Rocket WOW, Defendant Kim claimed that "the
higher loyalty and engagement from these differentiated experiences will further broaden our
customer funnel . . . ."  This statement was false and misleading because Coupang was selling
products to non-member customers at lower prices than those offered to its Rocket WOW
members.

87.     On March 22, 2022, *Korea JoonAng Daily* reported that the KFTC had opened yet
another investigation into Coupang.  This time the KFTC was reportedly examining claims that
Coupang had manipulated product reviews for its private-label branded products, sold through its
Coupang Private Label Business ("CPLB") subsidiary, to make them appear more positive.  The
article stated, in pertinent part, as follows:

> On March 15, civic groups such as the People's Solidarity for
> Participatory Democracy and The Voice of Consumers accused
> Coupang of making their employees write positive reviews for
> CPLB products.

CPLB is a subsidiary wholly owned by Coupang. It sells everyday items such as clothes, pet supplies and food on the e-commerce website.

*The civic groups claim Coupang ordered its employees to write positive reviews for some 42,000 CPLB products* since July last year, when the subsidiary started business. They said the reviews didn't explicitly state they were written by Coupang or CPLB workers, even though a disclaimer is required for reviews by employees of affiliates and people who were given the products for free.

*The FTC said it will investigate whether the civic groups' claims are true and if Coupang violated the Monopoly Regulation and Fair Trade Act and the Act on Fair Labeling and Advertising.*

According to the civic groups, a suspected Coupang or CPLB employee bought huge amount of products – 600 latex gloves, 350 masks, 150 liters (40 gallons) of cat litter sand throughout a month – and gave five stars to CPLB products but left one star ratings on non-Coupang products.

*The civic groups also claimed that the positive reviews and higher star ratings made CPLB products show up at the top of a search, giving them more exposure and leading to more purchases.*

88.    These revelations further showed investors the immense regulatory and reputational risks to which Coupang had exposed itself and failed to disclose, here by manipulating reviews on its own platform.  This undermined Coupang's relationship with its customers by manipulating reviews of its own products, thus presenting a rosier picture of those products than was justified by organic reviews.  Further, this harmed Coupang's relationship with its merchants by promoting Coupang's own products over the third-party products sold by those merchants.

89.    Meanwhile, Defendants maintained that Rocket WOW provided unique benefits to its customers, which would engender loyalty and help drive the company's growth.  For instance, during Coupang's earning call for the first quarter of 2022, on May 11, 2022, (the "Q1 2022 Earnings Call") Defendant Kim stated that the Company was "on a journey to make WOW an

indispensable part of our customers' lives."  This statement was false and misleading because Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members.

90.    Then, on July 13, 2022, *The Korea Times* released an article entitled "Coupang, Naver Hit By Antitrust Allegations," which reported that Coupang was now also under investigation by the KFTC for falsely advertising the membership benefits of its Rocket WOW membership services, stating, in pertinent part, as follows:

> Korea's two IT giants, Coupang and Naver, are under investigation by the Fair Trade Commission (FTC) over allegations that they ***falsely advertised membership benefits and deceived customers, according to industry watchers***, Wednesday.
>
> A dozen investigators with the antitrust agency were dispatched to the headquarters of Coupang in Songpa District, southeastern Seoul, and Naver in Bundang District of Seongnam, Gyeonggi Province, from late Monday through Tuesday, to conduct on-site investigations.
>
> ***Coupang allegedly sold goods to non-member customers at a lower price than those who paid monthly fees of 4,990 won ($3.82) for Wow membership, a sales practice Wow members characterize as reverse discrimination.***
>
> The allegation was first raised in May and amplified since then due to a large number of Coupang users filing complaints with a government website run by the Anti-Corruption & Civil Rights Commission.
>
> Many claimed that the prices shown to members and non-members alike indicate Wow members would be able to buy goods at cheaper prices compared to non-members, but the price is the same when Wow members make a purchase.

91.    These revelations indicated that Coupang's repeated representations about customer benefits of Rocket WOW were false and misleading.  In fact, Coupang was risking its relationship with its most loyal customers, along with exposing itself to regulatory risk, by upcharging Rocket WOW members.

92.     On this news, Coupang's stock price ***dropped $0.74 per share, or 5.0 percent,*** over the following two trading days to close at $14.25 per share on July 14, 2022.

93.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### C.     Additional Scienter Allegations Related to Exchange Act Claims

94.     During the Class Period, as alleged herein, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

95.     The Exchange Act Individual Defendants permitted Coupang to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

96.     As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Coupang, their control over, receipt, or modification of Coupang's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning Coupang, participated in the fraudulent scheme alleged herein.

97.     The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Coupang securities by disseminating materially false and misleading statements or concealing material

adverse facts.   The scheme deceived the investing public regarding Coupang's business, operations, and management and the intrinsic value of Coupang securities and caused Plaintiff and members of the Class to purchase Coupang securities at artificially inflated prices.

**D.    Loss Causation/Economic Loss**

98.    During the Class Period, as detailed herein, Coupang and the Exchange Act Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Coupang securities and operated as a fraud or deceit on Class Period purchasers of Coupang securities by misrepresenting the Company's business and prospects.   Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Coupang securities declined as the prior artificial inflation came out of the price over time.   As a result of their purchases of Coupang securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

**E.    Applicability of Presumption of Reliance: Fraud on the Market**

99.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased Coupang securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

100.    At all relevant times, the markets for Coupang securities were efficient for the following reasons, among others:

(a)    as a regulated issuer, Coupang filed periodic public reports with the SEC;

(b)    Coupang regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    Coupang was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    Coupang securities were actively traded in an efficient market, including its common stock that was traded on the New York Stock Exchange, under the ticker symbol "CPNG."

101.    As a result of the foregoing, the market for Coupang securities promptly digested current information regarding Coupang from publicly available sources and reflected such information in Coupang's securities prices.  Under these circumstances, all purchasers of Coupang securities during the Class Period suffered similar injury through their purchase of Coupang securities at artificially inflated prices and the presumption of reliance applies.

102.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

F.     **No Safe Harbor**

103.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Coupang who knew that the statement was false when made.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Coupang and the Exchange Act Individual Defendants**

104.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Coupang securities during the Class Period.

107.    Plaintiff and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Coupang securities. Plaintiff and Class members would not have purchased Coupang securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

108.    As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Coupang securities during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants**

109.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.    The Exchange Act Individual Defendants acted as controlling persons of Coupang within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control the actions of Coupang and its employees.  By reason of such conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII.    SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

### A.    Materially False and Misleading Statements and Omissions Contained in the IPO Materials

111.    The IPO Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

112.    The IPO Materials, which Coupang filed with the SEC in February and March 2021, stated in relevant part that Coupang's success and growth was rooted in and relied on, among other factors, its brand and reputation among customers, merchants, and suppliers, as well as its workforce:

> We believe that ***the recognition and reputation of our brand among our customers, merchants, suppliers, and our workforce has contributed to the growth and success of our business. Maintaining and enhancing the recognition and reputation of our brand is critical to our business and competitiveness.***

> \*        \*        \*

> ***That growth reflects our success in attracting, retaining, and increasing the engagement of our customers.*** In our experience, improvement in customer experience directly correlates with acceleration of customer engagement.

113. In the IPO Materials, Coupang emphasized that its future success depended on investments it makes in supporting merchants and customers, including by competing to offer the lowest prices:

> We believe that by investing for the long term in technology and ***infrastructure with a fanatical culture of customer centricity, we are delivering a superior customer experience at a lower cost and are continuing to redefine standards for e-commerce worldwide.***

> *        *        *

> To create ever-improving experiences at lower prices for customers, ***we focus on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions. These investments help us deliver superior selection, convenience, and low prices to customers while helping merchants to improve and grow their businesses.***

> *        *        *

> **Low Prices.** Our strategy is to provide the lowest prices available in the Korean market across a wide and diverse assortment of items. ***We achieve this through our diversified procurement strategy, which involves scaled procurement from local and international suppliers, direct sourcing from manufacturers, and our creation of a system that rewards merchants for providing competitive prices.*** In addition, ***cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices.***

114. In discussing its "Rocket WOW" membership program, Coupang described the program as, ""a customer loyalty program to offer ***even more value*** to [its] most engaged and frequent customers." The Company called the program "one of the key ***long-term drivers***" to Coupang's customer "***growth, retention, and engagement***" based on the program's purported perks, including "***exclusive discounts.***" The Company also noted its "inten[t] to ***continue***

*enhancing the value proposition* of Rocket WOW membership for [its] customers in the years to come."

115.    When discussing how it sources merchandise, Coupang stated:

> We have established an extensive network of suppliers and merchants, which enables us to obtain a wide selection of merchandise while maintaining low prices for customers. We offer millions of SKUs under our owned-inventory selection, which requires significant procurement expertise from local and international suppliers. We also source a large proportion of merchandise directly from manufacturers, which can result in better pricing for our customers. Our marketplace attracts a large number of merchants, including small and medium-sized businesses, *which enables us to obtain a wide and unique selection of merchandise. As a result, we are able to offer hundreds of millions of SKUs while delivering low prices and a superior experience for our customers.*

116.    Coupang further emphasized the importance of its merchants, and the merchant loyalty it fosters, as key to its ability to offer customers the best value:

> *How We Serve Merchants.* We believe that our merchants and the selection that they bring significantly enhance our customer offerings. We have expanded our merchant base over time and *fostered long-term merchant loyalty as we extended our value proposition through merchant solutions. We will continue to partner with merchants and provide solutions that enable them to grow, scale, and succeed.*
>
> *    *    *
>
> *Partnership With Small Merchants*
>
> *    *    *
>
> *We will continue supporting small merchants in 2021.* We are working with the Korean Fair Trade Commission on a joint program to provide small merchants with assistance with early settlement of transactions, securing loans, *and support for promotional programs, including coupons and advertising. We intend to continue supporting small merchants through further financial aid and marketing services.*

117.    According to Coupang, its competitive prices and varied inventory, keys to its success, were possible because of its merchants:

> In addition to our owned-inventory selection, we offer hundreds of millions of SKUs sourced from over 200,000 merchants on our marketplace. ***Our search technology produces a simplified experience that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph to show more unique products in search results, helping customers find, compare, and make purchasing decisions easily.***
>
> *            *            *
>
> ***Our ability to attract new customers and increase spend from existing customers depends on our ability to provide a superior experience. To this end, we offer a wide selection of products at competitive prices*** and an unparalleled delivery experience, convenient online shopping, and comprehensive customer service. ***We have developed technology that enables us to increase our operating efficiency through enhanced product merchandising and supply chain management, and to provide our customers with personalized product promotions and recommendations.***

118.    The IPO Materials represented that Coupang's search and recommendation functions enhanced customer experience by not organizing searches by merchant, but by product:

> AI-Driven Search and Personalized Recommendations. The foundation of our search and recommendations is a product knowledge graph ***that organizes by product, not by seller, which enhances the customer experience. Search and recommendation results are aided by deep learning, data analytics, and image recognition among other inputs to produce greater relevance and personalization***. As a result, we believe ***customers can identify what they want and the best value for that product easier through our tools than those on competitive services*** that require customers to sort through multiple sellers to compare offers for a given product.

119.    The IPO Materials downplayed an ongoing investigation by the Korean Fair Trade Commission ("KFTC") into Coupang's relationships with suppliers and failed to disclose the severity of the issues under review or the scope and nature of the Company's illegal and anti-

competitive behaviors that posed an exceptional risk of adverse regulatory action, stating, in

pertinent part, as follows:

> In 2019, LG Household & Healthcare ("LGHH") filed a complaint
> with the Korean Fair Trade Commission ("KFTC") alleging that
> [Coupang] violated the Korean Act on Fair Transactions in Large
> Retail Business and Monopoly Regulation and Fair Trade Act. The
> complaint claimed, among other issues, that [Coupang] engaged in
> unfair returns of LGHH products, illegally requested that LGHH
> disclose confidential business information, and unfairly refused to
> do business with LGHH.
>
> Following the complaint, the KFTC has made two field
> investigation visits to our office in July 2019 and October 2020. *We
> have provided documents and evidence in response to the
> investigation.* In addition to LGHH's allegations, the investigation
> addresses our negotiations and contracting with retail suppliers
> generally. *The investigation is ongoing, and we are cooperating
> with the investigation. Under Korean law, the issues addressed in
> the investigation can be resolved through civil, administrative, or
> criminal proceedings.* The ultimate case resolution *could include
> fines*, orders to alter our processes or procedures, and criminal
> investigations or charges against individuals or the company.

120.    The IPO Materials further mischaracterized the various forms of "consideration"

Coupang received from suppliers in exchange for its services, including "rebates" and "advertising

services," stating, in pertinent part, as follows:

> *The Company receives consideration from suppliers for various
> programs, including rebates, incentives, and discounts, as well as
> advertising services provided on its website and mobile
> applications.* The Company generally records these amounts
> received from suppliers to be a reduction of the prices the Company
> pays for their goods, and a subsequent reduction in cost of sales as
> the inventory is sold.

121.    The IPO Materials highlighted Coupang's marketing efforts and stated that the

Company's new advertising offerings and "promotions" would continue to positively expand

Coupang's addressable market, stating, in pertinent part, as follows:

> In addition to our e-commerce services, we also have a new offering
> in the online advertising space. *We offer opportunities to advertise*

40

> ***on our websites and mobile applications, including through banner advertisements, joint promotions, and other programs. This offering is in the early stages, and we will continue to innovate.*** In the near-to-medium term, we expect this offering to expand our total addressable market to include the advertising market, which was $12 billion in 2019 and is expected to grow to $14 billion by 2024.

*     *     *

> We market our offerings to customers directly through brand advertising and direct marketing. ***We use broad-based promotional campaigns, such as media ads, to promote opportunities our service provides. Our direct marketing primarily consists of customer discounts, promotions, and referrals. We attract customers through sponsored search, social networking sites, email marketing campaigns, and other similar initiatives.***

122.    In addition, the IPO Materials highlighted Coupang's focus on "Social Impact and Human Capital Resources" and "Initiatives For Our Workforce" and represented that Coupang was providing its employees with a "better" workplace – which the IPO Materials characterized as "one of the reasons for [Coupang's] success" – stating, in pertinent part, as follows:

> In a market where the industry standard is a six-day workweek, we were the first to establish a five-day workweek for our drivers, even as we became the first major service to provide deliveries to customers seven days a week. We also hire our drivers, Coupang Friends, directly, and provide them with paid time off and full benefits. The vast majority of drivers in the industry receive neither. Additionally, we are planning to grant up to ₩100 billion, or approximately $90 million, of restricted stock awards to our frontline workers and non-manager employees. We believe we are the first company in Korea to make our frontline employees stockholders.

*     *     *

> ***We hope such examples demonstrate that innovation can unlock both a better world for our customers and a better workplace for our employees . . . We want to inspire others to follow our lead.***

*     *     *

41

Founded in 2010, we are a home-grown technology company that has now become one of the three largest private sector employers in the nation. We are a significant driver of new economic opportunities for the people of Korea. As of December 31, 2020, we directly employed over 50,000 employees globally. ***We consider our employee relations to be positive.*** For example, we hire our Coupang Friends parcel delivery drivers as full-time employees ***with stable work, manageable hours, and competitive benefits, which differs from the market practice of employing parcel delivery drivers as contractors. We are committed to offering our employees industry-leading wages, comprehensive benefits, and training programs.***

***We subscribe to the philosophy that we, our suppliers, merchants, and employees should prosper together.***

\*      \*      \*

***Our employees and frontline workers are the backbone of Coupang and one of the reasons for our success.***

123.    The IPO Materials also credited the Company's "Technology," "Customer-to-Product Matching," "Social Impact and Human Capital Resources," "Initiatives For Our Workforce," and "Partnership With Small Merchants," among other factors, as keys to Coupang's competitiveness, stating, in pertinent part, as follows:

***We believe that we are well positioned to effectively compete on the basis of the factors listed above.*** We also face competition from major global Internet companies, such as eBay. However, at this time, foreign e-commerce companies have a limited presence in Korea.

124.    The statements in ¶¶ 112-123 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the IPO:

(a)      that Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including pressuring suppliers to raise prices of products on competing e-commerce platforms in order to ensure

Coupang's prices would be more competitive and coercing suppliers into purchasing advertisements that would benefit Coupang financially;

(b)    that Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform in order to prioritize its own private-label branded products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers;

(c)    that, unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members;

(d)    that Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions;

(e)    that all of the above illicit practices exposed the Company to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm the Company's critical relationships with consumers, merchants, suppliers, and the workforce; and

(f)    that Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable.

125.    The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties, and risks that required disclosure in the IPO Materials.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in

the IPO Materials of "the material factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how [the] risk affect[ed] [Coupang] or the securities being offered." The IPO Materials failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company in violation of Item 303 and Item 105. Indeed, the purported risk disclosures provided in the IPO Materials, to the extent they were relevant at all, were themselves materially misleading because they failed to disclose the true facts impacting Coupang's business, operations, and financial results and/or characterized materially adverse facts that had *already* materialized as contingent possibilities that *may* or *could* impact Coupang in the future but that had not yet materialized.

### B.    Events After the IPO

126.    On or around April 27, 2021, less than two months after the IPO, *United Press International* reported on systemic, unsafe working conditions for Coupang's delivery drivers and employees at Coupang's fulfillment centers, noting that nine Coupang workers had died over the past year due to an inhumane working environment. The report further stated that the Committee for Coupang Workers' Human Rights and Health, created to improve the Company's workplace conditions, was pushing to form a labor union to force a safer work environment in response to poor conditions at the Company. The report quoted the co-chairman of the committee as stating: "'The management method of running a business at the expense of people's lives should not be tolerated for any reason. Humans are not machines.'" The report further emphasized Coupang's efforts to "muzzle media coverage" by suing journalists who had written about the Company's worker deaths.

127.    On June 17, 2021, a deadly and devastating fire broke out in the basement of the Company's Deokpyeong Logistics Fulfillment Center, located south of Seoul. It took emergency response workers multiple days to extinguish the blaze. Tragically, one firefighter became trapped

in the building and was later found dead.  The fire sparked outrage among the public in South Korea.  Protestors claimed that the fire resulted from Coupang's imposition of inhumane working conditions.  According to a statement issued by a transportation union under the Korean Confederation of Trade Unions, "[a]ctivation of sprinklers was delayed because they were shut off due to frequent malfunction."  ***Thousands of users posted online claiming to have deleted their Coupang accounts under a hashtag that translated to "Leave Coupang."  Many of the posts chastised the Company's poor working conditions and accused Coupang of overworking its employees in its warehouses.***  Opposition lawmaker Kim Yong-pan, a member of the Public Administration and Security Committee in the National Assembly, South Korea's legislature, called the fire "a sad event that shows negligence of safety is still prevalent in our society."  ***Aside from consumer criticism, the fire cost Coupang millions of dollars in lost inventory, equipment, and other charges.***  Clearly, the fire damaged Coupang's business and badly harmed its reputation among current and potential customers.

128.    On July 5, 2021 several news outlets, including the *Financial Times* in an article titled "Coupang faces probe over alleged manipulation of search algorithms," reported that Coupang was being investigated over ***"allegations it manipulated search algorithms to [prioritize] its own products over those of suppliers,"*** by the Korea Fair Trade Commission.  Such manipulation not only exposed Coupang to regulatory consequences, but threatened the merchant relationships on which Coupang relied.

129.    Meanwhile, the damage caused to the Company by the June, 2021 fire and Coupang's unsafe and extreme working conditions was still being revealed.  On August 11, 2021, in its earnings release for the second quarter of 2021, Coupang reported a $518.6 million loss for the quarter, ***a fivefold increase from its  loss in the second quarter of 2020***.  This larger-than-

anticipated loss was due primarily to almost $300 million in inventory and equipment losses due to the June 2021 fire.  According to a *Financial Times* article dated August 12, 2021 discussing these developments, ***the fire was a major contributor to the losses.***  An article in *Korea JoongAng Daily* wrote that ***the fire "more than doubled [Coupang's] loss.***"

130.    On August 18, 2021, according to an article in *The Korea Times* dated August 19, 2021, ***Coupang was sanctioned by the KFTC for forcing "hundreds of [third-party] sellers from early 2017 to September 2020 to comply with its unlawful sales and marketing policies to maintain its competitive edge over other online retailers amid the fierce battle for market dominance."***  This included pressuring sellers to raise prices in goods sold at rival marketplaces "to ensure that [Coupang] could offer those products at the cheapest prices," and "coercing "suppliers to purchase ads."  Less than a week after Coupang again represented that its positive relationships with third-party sellers allowed Coupang to better serve its customers, investors were now learning that, in fact, Coupang was forcing third-party sellers to comply with its harsh and illegal policies.  This both exposed Coupang to large regulatory liability and threatened to harm the merchant relationships upon which Coupang relied.

131.    On September 10, 2021, ***a KFTC representative announced that Coupang was participating in, and would be regulated for, search algorithm manipulation that had improperly prioritized its own products over those of third-party sellers.***  This announcement signaled a significant expansion of the regulator's prior findings that Coupang had engaged in anti-competitive business practices with suppliers.  While attending the "Fairness and Transparency in Search Algorithms and Competition Issues" conference, Vice Chairman of the KFTC Kim Jae-Shin specifically mentioned Coupang by name when attacking e-commerce businesses engaged in illicit business practices such as search algorithm manipulation and stated: "[W]e have been

receiving complaints that major online shopping platforms placed their own private-brand (PB) products in a better place on their page, while pushing competitors' products down to the bottom."

132.    On November 12, 2021, Coupang released its quarterly financial report for the third quarter of 2021, disclosing much higher than anticipated costs, especially costs associated with labor and operations.   During the Q3 2021 Earnings Call, *Defendant Kim disclosed that the company was having trouble hiring employees and that this difficulty was attributable in part to the June, 2021 fire.  Further, Defendant Kim disclosed that the fire had "lead to [] inefficiency in [Coupang's] network." Similarly, in its financial report for the same quarter, Coupang stated that the fire had reduced the Company's capacity.*   This further revealed to investors that Coupang's dangerous working conditions, and the fire it caused, had seriously undermined Coupang's ability to deliver promised services to its customers, harming its business overall.

133.    On March 22, 2022, *Korea JoonAng Daily* reported that the KFTC had opened yet another investigation into Coupang.  This time the KFTC was reportedly examining claims that Coupang had manipulated product reviews for its private-label branded products, sold through its Coupang Private Label Business ("CPLB") subsidiary, to make them appear more positive.  The article stated, in pertinent part, as follows:

> On March 15, civic groups such as the People's Solidarity for Participatory Democracy and The Voice of Consumers accused Coupang of making their employees write positive reviews for CPLB products.
>
> CPLB is a subsidiary wholly owned by Coupang. It sells everyday items such as clothes, pet supplies and food on the e-commerce website.
>
> *The civic groups claim Coupang ordered its employees to write positive reviews for some 42,000 CPLB products* since July last year, when the subsidiary started business. They said the reviews didn't explicitly state they were written by Coupang or CPLB workers, even though a disclaimer is required for reviews by

employees of affiliates and people who were given the products for free.

*The FTC said it will investigate whether the civic groups' claims are true and if Coupang violated the Monopoly Regulation and Fair Trade Act and the Act on Fair Labeling and Advertising.*

According to the civic groups, a suspected Coupang or CPLB employee bought huge amount of products – 600 latex gloves, 350 masks, 150 liters (40 gallons) of cat litter sand throughout a month – and gave five stars to CPLB products but left one star ratings on non-Coupang products.

*The civic groups also claimed that the positive reviews and higher star ratings made CPLB products show up at the top of a search, giving them more exposure and leading to more purchases.*

134.    These revelations further showed investors the immense regulatory and reputational risks to which Coupang had exposed itself and failed to disclose, here by manipulating reviews on its own platform.  This undermined Coupang's relationship with its customers by manipulating reviews of its own products, thus presenting a rosier picture of those products than was justified by organic reviews.  Further, this harmed Coupang's relationship with its merchants by promoting Coupang's own products over the third-party products sold by those merchants.

135.    Then, on July 13, 2022, *The Korea Times* issued an article entitled "Coupang, Naver Hit By Antitrust Allegations," which reported that Coupang was now also under investigation by the KFTC for falsely advertising the membership benefits of its Rocket WOW membership services, stating, in pertinent part, as follows:

Korea's two IT giants, Coupang and Naver, are under investigation by the Fair Trade Commission (FTC) over allegations that they *falsely advertised membership benefits and deceived customers, according to industry watchers*, Wednesday.

A dozen investigators with the antitrust agency were dispatched to the headquarters of Coupang in Songpa District, southeastern Seoul, and Naver in Bundang District of Seongnam, Gyeonggi Province, from late Monday through Tuesday, to conduct on-site investigations.

> ***Coupang allegedly sold goods to non-member customers at a lower price than those who paid monthly fees of 4,990 won ($3.82) for Wow membership, a sales practice Wow members characterize as reverse discrimination.***
>
> The allegation was first raised in May and amplified since then due to a large number of Coupang users filing complaints with a government website run by the Anti-Corruption & Civil Rights Commission.
>
> Many claimed that the prices shown to members and non-members alike indicate Wow members would be able to buy goods at cheaper prices compared to non-members, but the price is the same when Wow members make a purchase.

136.    Based on post-IPO events and disclosures, including those described above, statements made in the IPO Materials were materially false or misleading.  By August 26, 2022, Coupang Class A common stock closed at approximately $17.14 per share – ***approximately 51 percent below*** the $35 per share price investors paid for the stock in the IPO less than a year-and-a-half earlier.

## COUNT III

**For Violation for Section 11 of the Securities Act Against Coupang, the Securities Act Individual Defendants, and the Underwriter Defendants**

137.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

138.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

139.    The IPO Materials contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

140.    Coupang is the registrant for the IPO.  Defendants were responsible for the contents and dissemination of the IPO Materials.  Each of the Securities Act Individual Defendants signed or authorized the signing of the IPO Materials on their own behalf.  The Underwriter Defendants marketed and underwrote the IPO and sold the majority of Coupang stock issued in the IPO to the Class.

141.    As the issuer of the shares, Coupang is strictly liable to the Class for the IPO Materials' material misstatements and omissions.  Signatories of the IPO Materials, and possibly other defendants, may also be strictly liable the Class for such material misstatements and omissions.  None of the defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the IPO Materials were complete, accurate, or non-misleading.

142.    As the issuer of the shares, Coupang is strictly liable the Class for the IPO Materials' material misstatements and omissions.  Signatories of the IPO Materials, and possibly other defendants, may also be strictly liable the Class for such material misstatements and omissions.  None of the defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the IPO Materials were complete, accurate, or non-misleading.

143.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

**COUNT IV**

**For Violation of Section 12(a)(2) of the Securities Act Against Coupang, The Securities Act Individual Defendants, and the Broker-Dealer Defendants**

144.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

145.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against Coupang, the Securities Act Individual Defendants, and the Broker-Dealer Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

146.     Each of the defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective prospectuses which respectively formed in relevant part the IPO Materials.  The actions of solicitation by the Securities Act Defendants include participating in the preparation of the false and misleading prospectuses and marketing the common stock to investors, including members of the Class.

147.     The prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

148.     Each of the Securities Act Defendants owed members of the Class who purchased or otherwise acquired Coupang common stock pursuant to the prospectuses issued in connection with the IPO Materials a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of the Securities Act Defendants' failure to exercise

51

reasonable care, the prospectuses contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

149.    Members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with IPO at the time they purchased or otherwise acquired Coupang common stock.

150.    By reason of the conduct alleged herein, the Securities Act defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, members of the Class who purchased or otherwise acquired Coupang common stock pursuant to the prospectuses issued in connection with the IPO Materials sustained substantial damages in connection therewith.  Accordingly, members of the Class who hold the common stock issued pursuant to the prospectuses issued in connection with the IPO Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their Coupang common stock seek damages to the extent permitted by law.

151.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

**COUNT V**

**For Violation of Section 15 of the Securities Act Against Coupang and the Securities Act Individual Defendants**

152.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

153.    This Count is brought under Section 15 of the Securities Act, 15 U.S.C. §77o, against defendants Coupang and the Securities Act Individual Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

154.    As detailed herein, each of the defendants committed primary violations of the Securities Act by engaging in conduct in contravention of Section11 of the Securities Act.

155.    The Securities Act Individual Defendants were each control persons of Coupang by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.  The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.

156.    The Company and the Individual Defendants took additional steps to cement their control over the Company and its affairs.  For example, the Company and the Individual Defendants created a dual class voting structure to ensure that public investors would effectively have no say over the management of Coupang and that the Company would not be subject to independent oversight after the IPO.  Class B shares entitled their holders to 29 votes, whereas Class A shares entitled their owners to just one.  Immediately following the IPO, Kim possessed over 76% of the voting power of the Company as a result of his ownership of all 174.8 million outstanding Class B shares.  As such, Kim had the ability to control the outcome of matters submitted to stockholders for approval, including the election of directors and the approval of any change in control transaction.

157.    By reason of the conduct alleged herein, the Company and the Securities Act Individual Defendants violated Section 15 of the Securities Act, and plaintiff and the Class have suffered harm as a result.

## VIII.    CLASS ACTION ALLEGATIONS

158.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)    All persons and entities that purchased or otherwise acquired Coupang securities during the period from March 11, 2021 and July 13, 2022, inclusive (the "Class Period"), and were damaged thereby, except those who are excluded below, as against the Defendants (as defined *supra*) for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; and

(b)    All persons and entities that purchased or otherwise acquired Coupang common stock pursuant, or traceable, or both, to the registration statement and prospectus issued in connection with the Company's March 2021 IPO, as against the Securities Act Defendants (as defined *supra*) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

(c)    Excluded from the Class are: (i) all defendants; (ii) members of the immediate family of any defendant who is an individual; (iii) any person who was an officer or director of Coupang during the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) Coupang's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

159.    The members of the Class are so numerous that joinder is impracticable. Coupang

Class A common stock is actively traded on the NYSE and tens of millions of shares were sold in

the IPO.  While the exact number of Class members is unknown to Plaintiff at this time and can

only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of

members in the Class.  Record owners and other Class members may be identified from records

procured from or maintained by the Company or its transfer agent and may be notified of the

pendency of this action using a form of notice similar to that customarily used in securities class

actions.

160.    Common questions of law and fact exist as to all Class members and predominate

over any questions solely affecting individual Class members, including:

(a)    Whether defendants violated the Securities Act or Exchange Act, or both;

(b)    Whether defendants omitted or misrepresented material facts, including

whether the IPO Materials misrepresented and/or omitted material information in violation of the

Securities Act;

(c)    Whether defendants' statements omitted material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading;

(d)    Whether, with respect to the Exchange Act claims only, the defendants

knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of Coupang securities was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate

measure of damages.

161.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

162.    Plaintiff will adequately protect the Class's interests.  It has retained counsel experienced in securities class action litigation and its interests do not conflict with the Class's.

163.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against defendants as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding Plaintiff and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Granting such other, further, and/or different relief as the Court deems just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 24, 2022

**LABATON SUCHAROW LLP**

/s/ Francis P. McConville
Francis P. McConville
David J. Schwartz
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
dschwartz@labaton.com

*Counsel for Plaintiff*

## CERTIFICATION

I, Ian Wylie, am Partner and Chief Operating Officer of Naya Capital Management UK Limited, hereby certify as follows:

1.     In my capacity as Partner and Chief Operating Officer of Naya Capital Management UK Limited, I am fully authorized to enter into and execute this certification on behalf of Naya 1740 Fund Ltd., Naya Coldwater Fund Limited, Naya Master Fund LP, and Nayawood LP (together, "Naya").

2.     I have reviewed a complaint prepared against Coupang, Inc. ("Coupang") alleging violations of the federal securities laws, and authorize the filing of this pleading;

3.     Naya did not transact in the securities of Coupang at the direction of counsel or in order to participate in any private action under the federal securities laws;

4.     Naya is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Naya fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

5.     Naya's transactions in Coupang securities are reflected in Exhibit A attached hereto;

6.     Naya sought to serve as a lead plaintiff and/or representative party in the following class action filed under the federal securities laws during the last three years:

*In re Resideo Technologies, Inc. Securities Litigation*, No. 0:19-cv-2863 (D. Minn.)

7.     Beyond Naya's pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __21__ day of October, 2022.

_____  Ian Wylie

*Ian Wylie*
Partner and Chief Operating Officer of
Naya Capital Management UK Limited,
Authorized Signatory for *Naya 1740 Fund Ltd.,
Naya Coldwater Fund Limited, Naya Master Fund
LP, and Nayawood LP*

**EXHIBIT A**

**TRANSACTIONS IN COUPANG, INC.**

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| | | | | | | |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 5/17/2021 | 715 | $33.74 | ($24,126.92) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 5/17/2021 | 72,556 | $34.94 | ($2,535,277.80) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 5/17/2021 | 1,229 | $33.98 | ($41,764.36) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 5/25/2021 | 24,900 | $39.59 | ($985,808.70) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 5/26/2021 | 6,900 | $41.24 | ($284,566.04) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Sell | 6/29/2021 | -106,300 | $38.25 | $4,065,975.00 |
| Naya 1740 Fund Ltd | CPNG Common Stock | Buy | 9/1/2021 | 42,251 | $31.15 | ($1,316,180.34) |
| Naya 1740 Fund Ltd | CPNG Common Stock | Sell | 1/10/2022 | -13,875 | $23.37 | $324,289.50 |
| Naya 1740 Fund Ltd | CPNG Common Stock | Sell | 1/11/2022 | -13,779 | $24.80 | $341,663.11 |
| Naya 1740 Fund Ltd | CPNG Common Stock | Sell | 1/12/2022 | -14,597 | $23.82 | $347,636.36 |
| | | | | | | |
| Naya 1740 Fund Ltd | CPNG 07/16/21 Call @ $50 | Sell | 6/29/2021 | -518 | $0.55 | $28,541.80 |
| Naya 1740 Fund Ltd | CPNG 07/16/21 Call @ $50 | Sell | 6/30/2021 | -199 | $0.64 | $12,680.28 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya 1740 Fund Ltd | CPNG 07/16/21 Call @ $50 | Option Expiration | 7/16/2021 | 717 | $0.00 | $0.00 |
| Naya 1740 Fund Ltd | CPNG 08/20/21 Call @ $47.50 | Sell | 8/4/2021 | -1,031 | $0.50 | $51,591.24 |
| Naya 1740 Fund Ltd | CPNG 08/20/21 Call @ $47.50 | Option Expiration | 8/20/2021 | 1,031 | $0.00 | $0.00 |
| Naya 1740 Fund Ltd | CPNG CFD | Buy | 6/29/2021 | 106,300 | $38.25 | ($4,065,975.00) |
| Naya 1740 Fund Ltd | CPNG CFD | Buy | 8/12/2021 | 37,000 | $34.53 | ($1,277,662.43) |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 9/1/2021 | -5,600 | $29.96 | $167,776.00 |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 1/4/2022 | -54,500 | $26.76 | $1,458,365.28 |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 1/5/2022 | -23,731 | $26.19 | $621,433.37 |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 1/10/2022 | -30,320 | $23.37 | $708,645.59 |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 1/11/2022 | -15,045 | $24.80 | $373,054.75 |
| Naya 1740 Fund Ltd | CPNG CFD | Sell | 1/12/2022 | -14,104 | $23.82 | $335,895.26 |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 5/17/2021 | 2,838 | $33.98 | ($96,442.03) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 5/17/2021 | 167,512 | $34.94 | ($5,853,264.44) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 5/17/2021 | 1,650 | $33.74 | ($55,677.50) |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya Coldwater Fund | CPNG Common Stock | Buy | 5/25/2021 | 57,600 | $39.59 | ($2,280,424.95) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 5/26/2021 | 16,000 | $41.24 | ($659,863.28) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 6/1/2021 | 14,363 | $41.48 | ($595,718.35) |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 6/29/2021 | -259,963 | $38.25 | $9,943,584.75 |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 9/1/2021 | 117,711 | $31.15 | ($3,666,869.51) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 10/1/2021 | 18,203 | $27.85 | ($506,953.55) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 10/29/2021 | 32,583 | $29.76 | ($969,670.08) |
| Naya Coldwater Fund | CPNG Common Stock | Buy | 11/1/2021 | 9,886 | $29.76 | ($294,207.36) |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 1/4/2022 | -12,100 | $26.62 | $322,049.62 |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 1/10/2022 | -40,377 | $23.37 | $943,699.97 |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 1/10/2022 | -6,103 | $23.37 | $142,640.63 |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 1/11/2022 | -44,560 | $24.80 | $1,104,906.60 |
| Naya Coldwater Fund | CPNG Common Stock | Sell | 1/12/2022 | -75,243 | $23.82 | $1,791,957.42 |
| | | | | | | |
| Naya Coldwater Fund | CPNG 07/16/21 Call @ $50 | Sell | 6/29/2021 | -1,269 | $0.55 | $69,921.90 |
| Naya Coldwater Fund | CPNG 07/16/21 Call @ $50 | Sell | 6/30/2021 | -571 | $0.64 | $36,384.12 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya Coldwater Fund | CPNG 07/16/21 Call @ $50 | Option Expiration | 7/16/2021 | 1,840 | $0.00 | $0.00 |
| Naya Coldwater Fund | CPNG 08/20/21 Call @ $47.50 | Sell | 8/4/2021 | -2,871 | $0.50 | $143,664.84 |
| Naya Coldwater Fund | CPNG 08/20/21 Call @ $47.50 | Option Expiration | 8/20/2021 | 2,871 | $0.00 | $0.00 |
| Naya Coldwater Fund | CPNG CFD | Buy | 6/29/2021 | 259,963 | $38.25 | ($9,943,584.75) |
| Naya Coldwater Fund | CPNG CFD | Buy | 6/30/2021 | 17,307 | $41.82 | ($723,778.74) |
| Naya Coldwater Fund | CPNG CFD | Buy | 7/15/2021 | 7,579 | $43.21 | ($327,459.79) |
| Naya Coldwater Fund | CPNG CFD | Buy | 8/12/2021 | 108,000 | $34.53 | ($3,729,393.04) |
| Naya Coldwater Fund | CPNG CFD | Sell | 9/1/2021 | -10,400 | $29.96 | $311,584.00 |
| Naya Coldwater Fund | CPNG CFD | Sell | 1/4/2022 | -150,500 | $26.76 | $4,027,228.90 |
| Naya Coldwater Fund | CPNG CFD | Sell | 1/5/2022 | -63,491 | $26.19 | $1,662,611.20 |
| Naya Coldwater Fund | CPNG CFD | Sell | 1/10/2022 | -101,442 | $23.37 | $2,370,924.34 |
| Naya Coldwater Fund | CPNG CFD | Sell | 1/11/2022 | -48,620 | $24.80 | $1,205,578.07 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya Coldwater Fund | CPNG CFD | Sell | 1/12/2022 | -18,396 | $23.82 | $438,111.83 |
| | | | | | | |
| Naya Master Fund LP | CPNG Common Stock | Buy | 5/17/2021 | 549,284 | $34.94 | ($19,193,278.72) |
| Naya Master Fund LP | CPNG Common Stock | Buy | 5/17/2021 | 9,306 | $33.98 | ($316,240.16) |
| Naya Master Fund LP | CPNG Common Stock | Buy | 5/17/2021 | 5,410 | $33.74 | ($182,554.73) |
| Naya Master Fund LP | CPNG Common Stock | Buy | 5/25/2021 | 188,718 | $39.59 | ($7,471,479.80) |
| Naya Master Fund LP | CPNG Common Stock | Buy | 5/26/2021 | 52,500 | $41.24 | ($2,165,176.39) |
| Naya Master Fund LP | CPNG Common Stock | Sell | 6/29/2021 | -805,218 | $38.25 | $30,799,588.50 |
| Naya Master Fund LP | CPNG Common Stock | Buy | 9/1/2021 | 341,939 | $31.15 | ($10,651,899.08) |
| Naya Master Fund LP | CPNG Common Stock | Sell | 10/1/2021 | -18,203 | $27.85 | $506,953.55 |
| Naya Master Fund LP | CPNG Common Stock | Sell | 11/1/2021 | -9,886 | $29.76 | $294,207.36 |
| Naya Master Fund LP | CPNG Common Stock | Sell | 1/10/2022 | -114,750 | $23.37 | $2,681,961.79 |
| Naya Master Fund LP | CPNG Common Stock | Sell | 1/11/2022 | -113,954 | $24.80 | $2,825,595.29 |
| Naya Master Fund LP | CPNG Common Stock | Sell | 1/12/2022 | -85,146 | $23.82 | $2,027,803.33 |
| | | | | | | |
| Naya Master Fund LP | CPNG 07/16/21 Call @ $50 | Sell | 6/29/2021 | -3,938 | $0.55 | $216,983.80 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya Master Fund LP | CPNG 07/16/21 Call @ $50 | Sell | 6/30/2021 | -1,512 | $0.64 | $96,344.64 |
| Naya Master Fund LP | CPNG 07/16/21 Call @ $50 | Option Expiration | 7/16/2021 | 5,450 | $0.00 | $0.00 |
| Naya Master Fund LP | CPNG 08/20/21 Call @ $47.50 | Sell | 8/4/2021 | -8,339 | $0.50 | $417,283.56 |
| Naya Master Fund LP | CPNG 08/20/21 Call @ $47.50 | Option Expiration | 8/20/2021 | 8,339 | $0.00 | $0.00 |
| Naya Master Fund LP | CPNG CFD | Buy | 6/29/2021 | 805,218 | $38.25 | ($30,799,588.50) |
| Naya Master Fund LP | CPNG CFD | Buy | 8/3/2021 | 34,300 | $36.95 | ($1,267,316.40) |
| Naya Master Fund LP | CPNG CFD | Buy | 8/12/2021 | 354,280 | $34.53 | ($12,233,790.41) |
| Naya Master Fund LP | CPNG CFD | Sell | 8/13/2021 | -42,280 | $34.53 | $1,459,928.40 |
| Naya Master Fund LP | CPNG CFD | Buy | 9/1/2021 | 16,000 | $29.96 | ($479,360.00) |
| Naya Master Fund LP | CPNG CFD | Sell | 1/4/2022 | -436,000 | $26.76 | $11,666,922.26 |
| Naya Master Fund LP | CPNG CFD | Sell | 1/5/2022 | -204,737 | $26.19 | $5,361,358.76 |
| Naya Master Fund LP | CPNG CFD | Sell | 1/10/2022 | -250,430 | $23.37 | $5,853,104.05 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Naya Master Fund LP | CPNG CFD | Sell | 1/11/2022 | -124,334 | $24.80 | $3,082,977.04 |
| Naya Master Fund LP | CPNG CFD | Sell | 1/12/2022 | -152,017 | $23.82 | $3,620,376.52 |
|  |  |  |  |  |  |  |
| Nayawood LP | CPNG Common Stock | Buy | 5/17/2021 | 1,812 | $33.98 | ($61,576.10) |
| Nayawood LP | CPNG Common Stock | Buy | 5/17/2021 | 106,935 | $34.94 | ($3,736,561.16) |
| Nayawood LP | CPNG Common Stock | Buy | 5/17/2021 | 1,053 | $33.74 | ($35,532.37) |
| Nayawood LP | CPNG Common Stock | Buy | 5/25/2021 | 36,800 | $39.59 | ($1,456,938.16) |
| Nayawood LP | CPNG Common Stock | Buy | 5/26/2021 | 10,200 | $41.24 | ($420,662.84) |
| Nayawood LP | CPNG Common Stock | Sell | 6/29/2021 | -156,800 | $38.25 | $5,997,600.00 |
| Nayawood LP | CPNG Common Stock | Buy | 9/1/2021 | 66,666 | $31.15 | ($2,076,743.23) |
| Nayawood LP | CPNG Common Stock | Sell | 1/10/2022 | -24,200 | $23.37 | $565,607.63 |
| Nayawood LP | CPNG Common Stock | Sell | 1/11/2022 | -22,450 | $24.80 | $556,668.61 |
| Nayawood LP | CPNG Common Stock | Sell | 1/12/2022 | -20,016 | $23.82 | $476,693.11 |
|  |  |  |  |  |  |  |
| Nayawood LP | CPNG 07/16/21 Call @ $50 | Sell | 6/29/2021 | -765 | $0.55 | $42,151.50 |
| Nayawood LP | CPNG 07/16/21 Call @ $50 | Sell | 6/30/2021 | -294 | $0.64 | $18,733.68 |

| Fund Name | Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Nayawood LP | CPNG 07/16/21 Call @ $50 | Option Expiration | 7/16/2021 | 1,059 | $0.00 | $0.00 |
| | | | | | | |
| Nayawood LP | CPNG 08/20/21 Call @ $47.50 | Sell | 8/4/2021 | -1,626 | $0.50 | $81,365.04 |
| Nayawood LP | CPNG 08/20/21 Call @ $47.50 | Option Expiration | 8/20/2021 | 1,626 | $0.00 | $0.00 |
| | | | | | | |
| Nayawood LP | CPNG CFD | Buy | 6/29/2021 | 156,800 | $38.25 | ($5,997,600.00) |
| Nayawood LP | CPNG CFD | Buy | 8/3/2021 | 6,700 | $36.95 | ($247,551.60) |
| Nayawood LP | CPNG CFD | Buy | 8/12/2021 | 60,720 | $34.53 | ($2,096,747.64) |
| Nayawood LP | CPNG CFD | Sell | 1/4/2022 | -84,000 | $26.76 | $2,247,755.66 |
| Nayawood LP | CPNG CFD | Sell | 1/5/2022 | -34,471 | $26.19 | $902,677.08 |
| Nayawood LP | CPNG CFD | Sell | 1/10/2022 | -52,808 | $23.37 | $1,234,239.98 |
| Nayawood LP | CPNG CFD | Sell | 1/11/2022 | -24,501 | $24.80 | $607,525.06 |
| Nayawood LP | CPNG CFD | Sell | 1/12/2022 | -28,440 | $23.82 | $677,315.75 |
| | | | | | | |